*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JACOB PAUL-ANTHONY BARNES,

        Defendant-Appellant.

UNPUBLISHED
August 15, 2019

No. 339431
Wayne Circuit Court
LC No. 16-010466-01-FC

Before: LETICA, P.J., and M. J. KELLY and BOONSTRA, JJ.

PER CURIAM.

Following a jury trial, defendant, Jacob Barnes, was convicted of first-degree murder on two theories, felony murder under MCL 750.316(1)(b) and premeditated murder under MCL 750.316(1)(a). He was also convicted of assault of a pregnant individual causing miscarriage, stillbirth, or death of an embryo or fetus, MCL 750.90b, and mutilation of a dead body, MCL 750.160. The trial court sentenced Barnes, as a fourth-offense habitual offender, MCL 769.12, to concurrent terms of life imprisonment for the murder conviction, 20 to 40 years' for the assault of a pregnant individual causing miscarriage, stillbirth, or death of an embryo or fetus conviction, and 20 to 40 years' for the mutilation of a dead body conviction. Barnes appeals as of right. We affirm but remand for the ministerial purpose of correcting the amended judgment of sentence.

## I. BASIC FACTS

This case arises from the murder of Amanda Benton in the early morning hours of September 26, 2016, by Jeremy Lee and Barnes.[1] Amanda was five-months pregnant when she was killed. Juan Torres and Hector Garcia testified that they witnessed her death.

---

[1] Lee pleaded guilty to second-degree murder and was sentenced to 25 to 60 years' imprisonment. In exchange for his plea, the other charges that Lee faced—first-degree

Torres testified that before the murder he was with Garcia, Lee, and Barnes. He overheard Barnes call a woman and invite her to "chill" with him. The woman was later identified as Amanda and cellphone records confirmed that Barnes's cellular phone had multiple contacts with Amanda's phone in the early morning hours of September 26, 2016. After the call, Barnes invited the group to a nearby gas station, and on the way, Barnes stated that Amanda owed him $200 for purchasing cocaine and that "she was gonna pay somehow." Torres stated that as they returned from the gas station, Barnes told the group to "walk slow," then ran up to Amanda's vehicle and got inside. The car shook back and forth for approximately five minutes. Torres testified that Lee went to see what was happening, then returned and said that he thought Barnes had killed Amanda. Torres saw Barnes grab Amanda by her neck and throw her onto the grass, and he watched Barnes use Amanda's vehicle for balance as he stomped on her neck several times. He said that Barnes pocketed Amanda's cellular phone before asking Lee to help him put the body in the trunk. As he closed the trunk, Barnes stated, "Oh, this is how I wanna see you die and this is what you get. This is my wish come true tonight." Lee and Barnes then left.

Similarly, Garcia testified that he overheard Barnes arrange to meet Amanda, that the group went to the gas station to purchase condoms because Barnes intended the group to rape Amanda when she arrived, that when they returned Barnes got into Amanda's vehicle, and that Lee looked in the vehicle and then stated that Barnes "already did it." Garcia also admitted to seeing Amanda's body on the grass and then watching Lee and Barnes throw her body into the trunk.

In addition, Cassandra Soto-Ramirez and Garcia testified that Lee made statements in their presence inculpating himself and Barnes in Amanda's murder. Soto-Ramirez testified that Lee stated he had carjacked Amanda's vehicle with Barnes, that he and Barnes had beaten Amanda, snapped her neck, stomped on her stomach, and then took her to an abandoned building and burned her body. Lee told her that he strangled Amanda and that Barnes "snapped her neck." Similarly, Garcia stated Lee told him and others that he and Barnes had thrown Amanda's body in an abandoned house and burned her corpse.

Statements that Barnes made to his cellmate, Carlos Thomas, were also admitted. Thomas recounted that Barnes told him that he was the "guy that was on the news for the pregnant lady being [killed]," and that he would not "be down here in this situation if the young guy didn't go bragging around the neighborhood about what they did." Thomas stated that Barnes described in "vivid detail" what happened to Amanda, noting that approximately two weeks before the murder, Amanda had stolen $175 worth of heroin from Barnes. According to Thomas, Barnes told him that since the theft he had been plotting Amanda's murder. Barnes narrated how he called Amanda and invited her to meet him and then, when she showed up, he "snapped" and started "beating her." Barnes "said the young guy said they could have found a less bloodier way to do what they was doing," which made Barnes mad so he "made [the young

---

premeditated murder, assault on a pregnant individual intentionally causing miscarriage, and mutilation of a dead body—were dismissed by the prosecution.

guy] choke" Amanda. Barnes added that he noticed he had a scratch on his face, and he "wasn't fixin' [sic] a go through the cleaning process," so they purchased gasoline, Barnes drenched Amanda's body, and then set her on fire.

## II. ADMISSIBILITY OF EVIDENCE

### A. STANDARD OF REVIEW

Barnes argues that the trial court abused its discretion by admitting statements that Lee made to Soto-Ramirez and Garcia inculpating Barnes. Specifically, he asserts that the evidence violated his rights under the Confrontation Clause and was inadmissible hearsay. We review for an abuse of discretion the trial court's decision to admit evidence. *People v McGhee*, 268 Mich App 600, 636; 709 NW2d 595 (2005). Whether the admission of the statements by Soto-Ramirez and Garcia violated Barnes's "Sixth Amendment right of confrontation is a question of constitutional law that this Court reviews de novo." *People v Nunley*, 491 Mich 686, 696-697; 821 NW2d 642 (2012). Barnes also contends that the statements should have been evaluated under MRE 403's balancing test and that his lawyer's failure to object on that basis constituted ineffective assistance. Unpreserved challenges to the admissibility of evidence are reviewed for plain error affecting a defendant's substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "[O]ur review of [an unpreserved] claim of ineffective assistance of counsel is limited to mistakes that are apparent on the record." *People v Mack*, 265 Mich App 122, 125; 695 NW2d 342 (2005).

### B. ANALYSIS

#### 1. CONFRONTATION CLAUSE

"The Confrontation Clause of the United States Constitution provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]' " *People v Fackelman*, 489 Mich 515, 524; 802 NW2d 552 (2011), quoting US Const, Am VI. "[T]he introduction of out-of-court *testimonial* statements violates the Confrontation Clause . . . ." *Nunley*, 491 Mich at 698 (emphasis added). In contrast, nontestimonial statements do *not* violate the Confrontation Clause. *Id.* at 715. In *Ohio v Clark*, ___ US ___, ___; 135 S Ct 2173, 2179-2180; 192 L Ed 2d 306 (2015), the United States Supreme Court distinguished between testimonial and nontestimonial statements, explaining:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. [quotation marks and citation omitted.]

Another factor that must be considered is "the informality of the situation and the interrogation," with a statement given in a formal interrogation setting with the police more likely to be characterized as testimonial, whereas a statement given under a less formal manner of inquiry is less likely to reflect that the primary purpose of such questioning was aimed at securing

testimonial evidence against the defendant. *Id*. at ___; 135 S Ct at 2180 (quotation marks and citation omitted). Also relevant is the identity of the person questioning the person giving the statements, because "[s]tatements made to someone *who is not* principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Id*. at ___; 135 S Ct at 2182 (emphasis added). The pivotal question the reviewing court must ask "is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to creat[e] an out-of-court substitute for trial testimony." *Id*. at ___; 135 S Ct at 2180 (quotation marks and citation omitted; alteration in original).

Barnes argues that Lee's statements to Soto-Ramirez and Garcia were testimonial because the primary purpose was to establish or prove past events potentially relevant to later criminal prosecution. We disagree. The record reflects that Lee's statements to Soto-Ramirez and Garcia were made in an informal, social setting. Soto-Ramirez explained that she frequently socialized with the Lee family, including Lee, Lee's sister Alexis, and Lee's brother Tyler. Soto-Ramirez stated that the group would congregate at her home and smoke marijuana and drink alcohol. Soto-Ramirez testified that Lee, Alexis, Tyler, and Lee's friends Garcia and Kaye visited her house on September 27, 2016, the day after the murder, and that Lee made the statements at that time. No one invited Lee to talk about the circumstances of Amanda's murder or questioned him about it. Instead, it appears that Lee took the opportunity of socializing with his friends to boast about his role in Amanda's murder and that Lee did not intend that his statements would be used to prosecute Barnes. There is nothing in the record indicates that Lee's statements were the product of questioning, the primary purpose of which was "to establish or prove past events potentially relevant to later criminal prosecution." *Id*. at ___; 135 S Ct at 2180. See also *People v Taylor*, 482 Mich 368, 371, 374, 379-380; 759 NW2d 361 (2008) (noting that the statements of a codefendant, casually and informally made, inculpating the defendant in a kidnapping and murder, were nontestimonial). Barnes's Sixth Amendment right of confrontation was not violated by Soto-Ramirez and Garcia's testimony regarding Lee's statements.

## 2. HEARSAY

Barnes also argues that Lee's statements to Soto-Ramirez and Garcia were inadmissible hearsay and that the hearsay exception in MRE 804(b)(3) was inapplicable. "While hearsay is generally inadmissible, the Michigan Rules of Evidence permit certain prior out-of-court statements to be admitted into evidence when a witness is unavailable." *People v Duncan*, 494 Mich 713, 717; 835 NW2d 399 (2013). MRE 804(b)(3) provides that a hearsay statement is admissible if the declarant is unavailable as a witness and if the declarant made a statement against his or her penal interest. This hearsay exception is grounded in the assumption that an individual will not make an inculpatory statement about himself or herself unless the statement is true and accurate. *People v Washington*, 468 Mich 667, 671; 664 NW2d 203 (2003).

Barnes first asserts that Lee was available as a witness, so MRE 804(b)(3) does not allow for the admission of his hearsay statements. It is well-established that a witness invoking his or her Fifth Amendment privilege against self-incrimination is considered unavailable under MRE 804 to testify as a witness. *People v Meredith*, 459 Mich 62, 66; 586 NW2d 538 (1998). Barnes contends that because Lee pleaded guilty to second-degree murder on February 24, 2017, and he

was sentenced on March 13, 2017, his Fifth Amendment privilege was insufficient to support a finding that he was unavailable under MRE 804. However, in Michigan a defendant's Fifth Amendment privilege is not lost merely because he or she has pleaded guilty and been sentenced. See *People v Den Uyl*, 318 Mich 645, 648, 651, 655; 29 NW2d 284 (1947) (stating that a witness in the process of appealing his conviction still had the protection against self-incrimination); *People v Giacalone*, 399 Mich 642, 644 n 3; 250 NW2d 492 (1977) (recognizing that under circumstances in which the witness's appeal of his conviction was pending he could still exercise his privilege against self-incrimination). At the time of trial, Lee could have still filed a motion to withdraw his guilty plea under MCR 6.310(C) or a delayed application for leave to appeal under MCR 7.205(G)(4). Under either circumstance, it is possible that he could incriminate himself by testifying at Barnes's trial notwithstanding the fact that he had pleaded guilty and was sentenced. Lee was, therefore, an unavailable witness as contemplated by MRE 804(a).

Next, relying on *People v Poole*, 444 Mich 151; 506 NW2d 505 (1993), overruled in part by *Taylor*, 482 Mich at 370, Barnes asserts that Lee's statements lacked indicia of reliability and should have been excluded. Our Supreme Court stated that the *Poole* Court's analysis pertaining to MRE 804(b)(3) "remains valid," and appellate courts should adhere to it in "determining the admissibility of a codefendant's statement under the hearsay exception for statements against a declarant's penal interest." *Taylor*, 482 Mich at 378. Therefore,

> where, as here, the declarant's inculpation of an accomplice is made in the context of a narrative of events, at the declarant's initiative without any prompting or inquiry, that as a whole is clearly against the declarant's penal interest and as such is reliable, the whole statement—including portions that inculpate another—is admissible as substantive evidence at trial pursuant to MRE 804(b)(3). [*Taylor*, 482 Mich at 379, quoting *Poole*, 444 Mich at 161.]

The record here reflects that Lee's statements inculpating Barnes in Amanda's murder and the mutilation of her body were made by Lee without prompting or inquiry and in the context of a narrative of events. In addition, Lee made the statements in a spontaneous manner and "without reservation" to his friends, as opposed to being questioned by law enforcement, and, similar to the statements of the codefendant in *Taylor*, Lee appeared to be motivated by a desire to boast about his involvement in Amanda's death. See *Taylor*, 482 Mich at 380. The statements were also, plainly, against Lee's penal interest, which lent credence to their reliability. Accordingly, on this record, the trial court did not abuse its discretion by determining that Lee's statements inculpating Barnes were admissible under MRE 804(b)(3).

Finally, Barnes asserts that Lee's statements should have been excluded under MRE 403. In support, he directs this Court to another evidentiary decision of the trial court relating to statements attributed to Lee. Specifically, the prosecution sought to introduce a videotape of the police interrogation of Barnes. During the interrogation, a police detective made a number of remarks indicating that Lee had told the police that Barnes was involved in the murder. The court excluded those statements under MRE 403, noting that Lee's statements as recounted by the officer during the interrogation were not offered for the truth of the matter asserted as they were only offered to give context to Barnes's interrogation. Given the limited purpose of the statements in the interrogation, the court held that "there is significant danger that the jury would improperly give those statements unfair weight."

In contrast, the statements Lee made to Soto-Ramirez and Garcia were admitted as *substantive* evidence of his guilt, so their probative value was different than that of the statements attributed to Lee during the police interrogation. "Evidence is unfairly prejudicial when there exists a danger that *marginally* probative evidence will be given undue or preemptive weight by the jury." *People v Crawford*, 458 Mich 376, 398; 582 NW2d 785 (1998) (emphasis added). Lee's statements inculpating Barnes were far from "marginally probative" given that they bore heavily on Barnes's role in Amanda's murder and the mutilation of her body. Moreover, while the evidence was prejudicial to Barnes, there is no indication that it was "unfairly so" to the extent it was given undue or preemptive weight by the jury. *Id.* Accordingly, Barnes's argument that the evidence ought to have been excluded under MRE 403 is unavailing because the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. For the same reasons, we conclude that Barnes's defense lawyer was not ineffective for failing to object to the challenged testimony under MRE 403. See *People v Fonville*, 291 Mich App 363, 384; 804 NW2d 878 (2011) (stating that a defense lawyer is not ineffective for failing to raise an objection that would have ultimately proven futile).

## III. GREAT WEIGHT OF THE EVIDENCE

### A. STANDARD OF REVIEW

Next, Barnes argues that the jury's verdict was against the great weight of the evidence because of inconsistencies and conflicts in the witness testimony at trial. This issue is unpreserved because Barnes did not move for a new trial in the trial court. *People v Cameron*, 291 Mich App 599, 617; 806 NW2d 371 (2011). Accordingly, we review this issue for plain error affecting Barnes's substantive rights. See *id.*

### B. ANALYSIS

In reviewing whether a verdict is against the great weight of the evidence, this Court must determine "whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." *People v McCray*, 245 Mich App 631, 637; 630 NW2d 633 (2001). A verdict generally may be overturned as against the great weight of the evidence when it is not reasonably supported by the evidence admitted at trial and the verdict was "more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009).

Barnes argues that the evidence at trial preponderated heavily against the jury's verdict because several witnesses gave conflicting testimony on several different aspects of the case. Specifically, he points out inconsistencies between and among the testimony from Soto-Ramirez, Garcia, Torres, and Thomas. However, although there were inconsistencies among the witnesses' testimony, it is well-established that conflicting testimony and questions involving witness credibility are not sufficient grounds for vacating a conviction. *Id.* at 469-470, citing *People v Lemmon*, 456 Mich 625, 647; 576 NW2d 129 (1998). Moreover, the inconsistent testimony did not "contradict indisputable physical facts or laws," was not "patently incredible" or in defiance of "physical realities," and was not such that a reasonable juror would reject it because it was so "inherently implausible" that it was unbelievable. *Lemmon*, 456 Mich at 643-

644. Similarly, the testimony was not so seriously impeached that it could not be accepted by the jury, and, in our view, particularly because Garcia and Torres's testimony was substantially similar in the time, place, and manner of Amanda's death and Barnes's statements to them, this was not a case that was fraught with uncertainties and discrepancies that would necessitate a new trial. *Id*. at 644. Consequently, the jury's verdict was not against the great weight of the evidence.

## IV. SUFFICIENCY OF THE EVIDENCE

### A. STANDARD OF REVIEW

Barnes next argues that there was insufficient evidence to sustain his convictions for felony murder, premeditated murder, and assault of a pregnant individual intentionally causing miscarriage, stillbirth, or death of an embryo or fetus. This Court reviews de novo a defendant's challenge to the sufficiency of the evidence. *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015). We review the evidence in the light most favorable to the prosecutor, drawing all reasonable inferences and making all credibility choices in support of the jury verdict. *Id*.

### B. ANALYSIS

Barnes argues that there was insufficient evidence to sustain his first-degree felony-murder conviction because there was no evidence that he intended to permanently deprive Amanda of her property when he took her vehicle and her cellular phone. "The elements of felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b)." *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009). The predicate felony in this case was larceny based on Barnes's theft of Amanda's cellular phone and vehicle. The elements of larceny are:

> (1) an actual or constructive taking of goods or property, (2) a carrying away or asportation, (3) the carrying away must be with a felonious intent, (4) the subject matter must be the goods or personal property of another, (5) the taking must be without the consent and against the will of the owner. [*People v Cain*, 238 Mich App 95, 120; 605 NW2d 28 (2000) (quotation marks and citation omitted).]

On appeal, Barnes argues that the prosecution failed to prove that he intended to permanently deprive Amanda of her vehicle or her cellular phone. Because a defendant's intent can be "difficult" to establish, it may be proven by minimal circumstantial evidence. *People v Harverson*, 291 Mich App 171, 178; 804 NW2d 757 (2010). The trial testimony established that Barnes entered Amanda's vehicle, beat her, threw her from the vehicle, and then repeatedly stomped on her neck. After doing so, he picked up Amanda's cellular phone and placed it in his pocket. The phone was later located in Barnes's mother's house. Barnes's mother testified that her boyfriend purchased the phone from Lee for $30. Barnes believes that because the testimony showed that Lee sold the phone, there is insufficient evidence to show that Barnes intended to

-7-

permanently deprive Amanda of her phone. However, the record still reflects that Barnes took Amanda's cellular phone and, under the circumstances, the jury could reasonably infer that when he did so he intended to permanently deprive her of the phone. Therefore, there is sufficient evidence to support the felony-murder conviction.

Next, Barnes asserts that there is insufficient evidence to sustain his conviction of premeditated murder. To prove Barnes committed premeditated murder, the prosecution had to provide proof beyond a reasonable doubt that Barnes intentionally killed Amanda with premeditation and deliberation. See *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018). "Premeditation and deliberation may be established by an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a 'second look.' " *Id*. at 242.

In support of his argument, Barnes points to testimony from Thomas that when Barnes saw Amanda's face he "snapped." However, Barnes also told Thomas that he had planned the murder since Amanda stole $175 in drugs from him approximately two weeks earlier. Moreover, just before the murder he told Torres that he planned to make Amanda pay for her actions. Torres testified that Barnes called Amanda, inviting her to "chill" with him. According to Torres and Garcia, when Amanda arrived, he told Garcia, Torres, and Lee to wait, got in Amanda's vehicle and beat her. He then threw her from the vehicle and proceeded to stomp on her neck repeatedly. After tossing her body in the trunk of her own vehicle, he stated, "Oh, this is how I wanna see you die" and "[t]his is my wish come true tonight." Barnes's statements to Thomas and Lee's statements to Soto-Ramirez and Garcia corroborated Garcia and Torres's testimony. Barnes's statement to Thomas was also evidence that, after the murder, he attempted to erase evidence of his involvement by purchasing gasoline, drenching Amanda's body, and setting it on fire. The record also reflects that in the days after the murder, he fled from the police. See *People v Unger*, 278 Mich App 210, 226; 749 NW2d 272 (2008). Viewed in the light most favorable to the jury's verdict, there is sufficient evidence to establish that Barnes planned to murder Amanda for stealing from him, he lured her to his location, and he carried out his plan.

Finally, Barnes asserts that the evidence was insufficient to convict him of assault of a pregnant individual intentionally causing miscarriage, stillbirth, or death of an embryo or fetus because there is no evidence that he knew Amanda was pregnant. However, the jury did not convict Barnes of assault of a pregnant individual intentionally causing miscarriage, stillbirth, or death of an embryo or fetus, MCL 750.90a. Instead, the jury convicted him of assault on a pregnant individual causing miscarriage, stillbirth, or death of an embryo or fetus, MCL 750.90b. Accordingly, the prosecution was not required to prove that Barnes was aware Amanda was pregnant, so Barnes's claim of insufficient evidence is without merit.

## V. MOTION FOR MISTRIAL

### A. STANDARD OF REVIEW

Barnes argues that the trial court abused its discretion in declining to declare a mistrial after an outburst by Amanda's family during the proceedings in the trial court. "This Court reviews for an abuse of discretion the trial court's decision to deny a defendant's motion for a

mistrial." *People v Lane*, 308 Mich App 38, 60; 862 NW2d 446 (2014). A court abuses its discretion if its decision is outside the range of reasonable outcomes. *Id*.

## B. ANALYSIS

In *People v Dickinson*, 321 Mich App 1, 18; 909 NW2d 24 (2017), this Court recognized that a trial court should only grant a motion seeking a mistrial for irregularities that are prejudicial to the defendant's rights and undermine the defendant's right to a fair trial. The moving party must also demonstrate that the issue allegedly undermining the defendant's right to a fair trial "is so egregious that the prejudicial effect cannot be removed other than by the trial court declaring a mistrial. *Id*.

Here, during a graphic portion of Torres's testimony, the trial court interrupted the proceedings to ask that a member of Amanda's family leave the courtroom until she could regain her composure. At that point, Amanda's mother challenged the trial court verbally with respect to this decision, and the court ordered that she be barred from the proceedings for the rest of the trial. Thereafter, another spectator apparently threatened Barnes, but the trial judge stated that it did not believe the jury could hear the threat because the judge did not hear the threat. Nevertheless, the trial court subsequently ordered another individual out of the courtroom after witnessing an issue of concern with that individual outside the presence of the jury. When the jurors returned to the courtroom, the trial court instructed them that sympathy could not influence their verdict and that their verdict must be based on the evidence presented at trial. The trial court also instructed the jurors, in formulating their verdict, to give "no value" to what they may have witnessed in the courtroom from Amanda's family. Given the court's handling of the outbursts and its decision to instruct the jury that it may not decide its verdict on the basis of sympathy for Amanda or her family and that it must determine its verdict on the basis of the evidence, it is clear that the trial court took careful and concerted action to alleviate any prejudice that Barnes may have incurred as a result of the emotional outbursts in the courtroom. See *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003) (stating that this Court will presume that the jury followed its instructions, and "instructions are presumed to cure most errors."). Accordingly, we conclude that the court's decision to deny Barnes's motion for a mistrial did not amount to an abuse of discretion. *Lane*, 308 Mich App at 60.

## VI. PROSECUTORIAL ERROR

## A. STANDARD OF REVIEW

Barnes contends that his right to a fair trial was violated when the prosecution denigrated his trial lawyer in front of the jury and commented on facts not in evidence. Barnes did not preserve his allegations of prosecutorial error by raising a timely and specific objection or requesting a curative instruction. See *People v Callon*, 256 Mich App 312, 329; 662 NW2d 501 (2003). Therefore, our review is limited to outcome-determinative, plain error. *Id*.

## B. ANALYSIS

In *People v Mullins*, 322 Mich App 151, 172; 911 NW2d 201 (2017), this Court explained:

> Prosecutorial misconduct issues are decided on a case-by-case basis. This Court reviews the prosecutor's remarks in context to determine whether the defendant was denied a fair and impartial trial. *The prosecutor's statements are to be evaluated in light of defense arguments and the relationship the comments bear to the evidence admitted at trial.* Generally, prosecutors are given great latitude regarding their arguments and are free to argue the evidence and all reasonable inferences from the evidence as they relate to their theory of the case. [citations and quotation marks omitted; emphasis added.]

Barnes maintains that the prosecution's comments about his lawyer during rebuttal argument misled the jury regarding why the prosecution did not call Lee as a witness. He asserts that the prosecution's comments amounted to impermissible disparaging of his lawyer "with the sole purpose to have the jury believe that [his lawyer] was not a credible person." The record reflects that the prosecution did accuse Barnes's lawyer of "misleading" the jury. However, viewed in context, it is clear that the prosecutor was responding to a key theme of Barnes's lawyer's closing argument. Specifically, Barnes's lawyer argued that the prosecution's case against Barnes was undermined and did not establish Barnes's guilt beyond a reasonable doubt because Lee was not called as a witness. Thus, rather than being made with the aim of attacking Barnes's lawyer and his credibility, the comments are fairly understood as a response to the defense argument. See *id*. Furthermore, a curative instruction could have alleviated any prejudice to Barnes arising from the prosecution's statement. See *Unger*, 278 Mich App at 235 (stating that this Court will not "find error requiring reversal where a curative instruction could have alleviated any prejudicial effect"). Finally, during its final instructions to the jury, the court instructed the jury that the comments of the lawyers were not evidence, and this Court presumes that the jury followed its instructions. *Id*.

Next, Barnes claims that the prosecution argued facts not in evidence when it made the following comments during rebuttal argument:

> When [Barnes's lawyer] talks about there being no evidence in [Amanda's] . . . Neon, don't you think that's strange that all the other cars that were processed had fingerprints and that the Neon had no fingerprints on it. It was wiped clean. Not one fingerprint. Not Amanda's. Not her boyfriend's. Nobody's. Why is that? Because the car was wiped clean.

There was no evidence directly stating that the vehicle was "wiped clean." However, given the lack of evidence in the vehicle, and Thomas's testimony that Barnes burned Amanda's body because she scratched his face and may have had DNA under her nails, it is reasonable to infer that the interior of the vehicle was wiped clean. Moreover, to the extent that the argument was, in fact, improper if Barnes's lawyer had raised a timely objection, a curative instruction could have alleviated any prejudice to Barnes arising from the comment. Further, as noted earlier, the jury is presumed to have followed the court's instruction to decide the case based on the

evidence presented, not on the lawyer's comments. Thus, the prosecution's comments regarding whether the vehicle was wiped clean did not deprive Barnes of his right to a fair trial.

## VII.  NEWLY DISCOVERED EVIDENCE

### A.  STANDARD OF REVIEW

Barnes asserts that the trial court abused its discretion by denying his motion for a new trial on the basis of newly discovered evidence and that his defense lawyer was ineffective for not interviewing Lee and calling him as a witness at trial.  This Court reviews for an abuse of discretion a trial court's decision to deny a defendant's motion for a new trial.  *People v Cress*, 468 Mich 678, 691; 664 NW2d 174 (2003).  A "mere difference" in judicial opinion does not in itself amount to an abuse of discretion.  *People v Johnson*, 502 Mich 541, 564; 918 NW2d 676 (2018).  The trial court's factual findings are reviewed for clear error.  *Cress*, 468 Mich at 691.

### B.  ANALYSIS

Following Barnes's conviction, Desiree Edwards was retained as a private investigator by Barnes's appellate lawyer.  In an affidavit, she averred in relevant part that she had met with Lee in February 2018 and that he had "adamantly denied that he ever spoke to Cassandra Soto-Ramirez or made incriminating statements about himself or [Barnes] to her on September 27, 2016," he "emphatically stated that he hates Cassandra Soto-Ramirez and would never talk to her," and he made numerous statements inculpating himself and exculpating Barnes.  Barnes's appellate lawyer filed a motion in this Court seeking remand to the trial court.  We granted the motion and remanded to the trial court "so that defendant may bring a motion for the relief he considers appropriate limited to the claim of newly discovered evidence advanced in the motion to remand and have an evidentiary hearing on that matter."[2]  Subsequently, in the trial court, Barnes filed a motion seeking a new trial on the basis of newly discovered evidence.

At the evidentiary hearing, Lee invoked his Fifth Amendment right against self-incrimination and did not testify.  Instead, Edwards testified regarding the interview she had with Lee in February 2018.  She testified that Lee told her that Amanda contacted him to purchase drugs and he agreed to sell them to her.  Lee stated that he asked Barnes to attack Amanda and, although Barnes did not want to, he did so because Lee threatened him.  Lee added that it was Barnes who beat Amanda up in the vehicle, but "that was all that he did" and Barnes was not "fine" with doing it.  Lee stated that he personally strangled Amanda.  Then, after he placed her in the trunk, he ordered Barnes to drive around to find a house where they could dispose of her body.  Barnes did so even though he did not want to.  Edwards added that Lee told her it was his idea to burn the body, and Barnes did not want anything to do with it.  Lee apparently took the body into the house and burned it while Barnes, who did not want anything to do with it, waited in the car.  Edwards stated that Lee referred to Barnes "as being a little retarded" and as being a "pussy."  Ultimately, she testified that Lee took full responsibility for Amanda's death, stated

---

[2] *People v Barnes*, unpublished order of the Court of Appeals, entered April 4, 2018 (Docket No. 339431).

that Barnes had no responsibility and did not know what Lee intended to do when Amanda arrived, and stated that he did not tell Barnes because Barnes would not have wanted to do anything. She added that Lee only accused Barnes because his lawyer advised him to do so.

The trial court denied the motion for a new trial, citing numerous deficiencies with the evidence. In particular, the court found that the evidence was newly available, not newly discovered. It also found that Lee's statements to Edwards amounted to a false confession that was "bereft of credibility," and it found that, in any event, Edwards's testimony was inadmissible hearsay.

"For a new trial to be granted on the basis of newly discovered evidence, a defendant must show that: (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial." *Cress*, 468 Mich at 692 (quotation marks and citation omitted). It is the defendant who bears the burden of satisfying all four elements of this test. *People v Rao*, 491 Mich 271, 279; 815 NW2d 105 (2012). A codefendant's testimony can be newly discovered if the defendant was not aware of it at the time of trial, but, if the defendant knew or should have known about the codefendant's testimony before or during trial, a new trial is not available under the test for newly discovered evidence. *People v Terrell*, 289 Mich App 553, 567, 570; 797 NW2d 684 (2010), overruled in part on other grounds by *People v Grissom*, 492 Mich 296, 320; 821 NW2d 50 (2012).

In *Terrell*, this Court held "when a defendant knew or should have known that a codefendant could provide exculpatory testimony, but did not obtain that testimony because the codefendant invoked the privilege against self-incrimination, the codefendant's posttrial statements do not constitute newly discovered evidence, but are merely newly available evidence." *Id*. at 555. In *Terrell*, although the codefendant testified at the evidentiary hearing that the defendant's lawyer had not spoken with the codefendant until the defendant's trial was over, this Court concluded that the defendant ought to have been aware of the codefendant's "material testimony regarding [the] defendant's role in the charged crime." *Id*. at 569-570. For example, the defendant and the codefendant were close friends since childhood. *Id*. at 570. Moreover, the codefendant's version of events reflected that both he and the defendant were at the scene of the shooting in that case. *Id*. at 555, 570. Therefore, "even if [the codefendant] and [the] defendant never had a conversation about the [codefendant's] testimony before or during trial," this Court concluded that the defendant was certainly cognizant at all times that the codefendant was in a position to offer the testimony. *Id*. at 570. Under these circumstances, this Court concluded that the defendant knew, or ought to have known, before his trial that the codefendant could have provided the testimony at issue. *Id*.

In this case, it is clear that Barnes knew, or ought to have known, that Lee possessed exculpatory information before trial, even though Lee pleaded guilty to second-degree murder and testified regarding the facts of his involvement at his plea hearing. This is because, like the defendant and codefendant in *Terrell*, Barnes and Lee were friends, both were present when Amanda was murdered and her body burned, and both spent time together evading the police after the murder. The fact that Lee admitted to his involvement in this murder and placed blame on Barnes does not alter our analysis, because Barnes, who continues to proclaim his innocence,

would nonetheless have known that Lee's testimony at the plea hearing, and his statements to Soto-Ramirez and Garcia, were false, and Barnes therefore could have taken steps to pursue the appropriate procedural remedies to secure Lee's exculpatory testimony. See *Rao*, 491 Mich at 284 ("The point is that the law affords a defendant procedural avenues to secure and produce evidence and, under *Cress*, a defendant must employ these avenues in a timely manner because evidence that is known to the defendant, yet not produced until after trial, will not be considered grounds for a new trial."). Such mechanisms are in place to require defendants to adhere to their duty to engage in due diligence to secure the proffered testimony and to avoid "judicial sandbagging." *Id*. at 569. Accordingly, we agree with the trial court's assessment that Lee's alleged exculpatory testimony was not newly discovered evidence as contemplated by *Cress*, and the record reflects that Barnes, in the exercise of reasonable diligence, could have secured and produced the evidence at trial. *Cress*, 468 Mich at 692. If this Court were to reverse the trial court's order denying Barnes's motion for a new trial on the basis of newly discovered evidence, as the record reflects that Barnes was aware, or ought to have been aware, of this evidence before trial and could have exercised reasonable diligence to present it at trial, we "would reward carelessness, neglect and gamesmanship, at the expense of thorough trial preparation and the finality of criminal judgments." *Rao*, 491 Mich at 285.

In addition, we discern no clear error in the court's assessment of the credibility of Lee's statement. "A false confession (i.e., one that does not coincide with established facts) will not warrant a new trial, and it is within the trial court's discretion to determine the credibility of the confessor." *Cress*, 468 Mich at 692. When determining the credibility of the evidence, the trial court is tasked with considering "all relevant factors tending to either bolster or diminish the veracity of the witness's testimony." *Johnson*, 502 Mich at 567. Barnes asserts that to the extent that Lee's statements to Edwards are inconsistent with the trial testimony, the reason for the inconsistency is because Torres, Garcia, Soto-Ramirez, and Thomas gave false testimony. Based on our review of the record, numerous inconsistencies between Lee's confession to Edwards and the trial testimony exist. For example, the trial testimony established that Barnes called Amanda to set up the meeting, whereas Lee told Edwards he called Amanda. Next, there was testimony that Barnes planned to make Amanda pay for stealing drugs from him and that, after luring her to his location, he entered her vehicle and beat her. Contrary to Lee's confession to Edwards, Barnes then threw Amanda from the vehicle and repeatedly stomped on her neck. And, rather than Lee directing Barnes to help him, the trial testimony was that Barnes had Lee help him put the body in the trunk before expressing pleasure at the fact that his "wish" to see Amanda die had come true. Furthermore, Lee's statements to Soto-Ramirez and Garcia indicated that it was Barnes who initiated the burning of the body, and Barnes's statements to Thomas confirmed that he, not Lee, drenched the body in gasoline and set it on fire. Aspects of the trial testimony were corroborated by cellular phone records, medical testimony, and testimony showing that Barnes was concerned with having access to money if he was "caught."

Despite the inconsistencies, we discern no merit to Barnes's suggestion that the trial court must have erred by crediting false trial testimony from Torres, Garcia, Soto-Ramirez, and Thomas as opposed to crediting the confession Lee gave to Edwards. The trial court was allowed to—and was in fact required to—weigh the credibility of Lee's confession to Edwards against the trial testimony and was not prohibited from concluding that the trial testimony was credible and the new confession was false. See *Johnson*, 502 Mich at 571, 577. Moreover, the evidence at trial demonstrated that Lee had a reason to confess to being solely responsible for

-13-

Amanda's murder. Specifically, Thomas testified that Barnes told him that he blamed the "young guy," i.e., Lee, for being caught and he told Thomas that, if not for his relationship with Lee's uncle, he would have killed Lee. See *Johnson*, 502 Mich at 570 (recognizing that in determining the credibility of evidence, a trial court must discern whether a "reasonable juror also could have credited the fact that [the witness] lacked any motive to lie in this case.)."

In sum, the trial court did not abuse its discretion in denying Barnes's motion for a new trial based on newly discovered evidence in the form of Lee's confession. As found by the trial court, Lee's confession contradicted much of the trial testimony concerning the murder and he had a motive to lie. The trial court had discretion to find Lee's confession incredible and to determine that he was a false confessor, and it did not err by exercising that discretion. Further, given that the evidence was not, in actual fact, newly discovered, a new trial on that basis was unwarranted.[3]

In his brief on appeal, Barnes also argues that his defense lawyer's performance fell below an objective standard of reasonableness because he did not investigate Lee as a witness or call him as a witness at trial. According to Barnes, because his lawyer did not call Lee at trial he was denied the opportunity to present exculpatory evidence that Lee killed Amanda and burned her body without assistance from Barnes. However, Barnes has failed to establish the factual predicate for his claim. See *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). Nothing on the record suggests that, had he been called to testify at Barnes's trial, Lee would have testified instead of invoking his Fifth Amendment right against self-incrimination. Further, there is nothing on the record indicating that, at that point in time, Lee would have been willing to offer testimony exculpating Barnes. As a result, we conclude that Barnes has failed to establish that he is entitled to a new trial on the basis of ineffective assistance of his trial lawyer.

## VIII. CONCLUSION

The trial court did not abuse its discretion by admitting Soto-Ramirez and Garcia's testimony regarding Lee's statements to them, and those nontestimonial statements did not violate Barnes's right to confrontation. Barnes's convictions were supported by sufficient evidence and were not against the great weight of the evidence. Further, Barnes has not established prosecutorial error warranting reversal. Finally, the trial court did not abuse its discretion in denying Barnes's motion for a new trial based on newly discovered evidence.

---

[3] Contrary to Barnes's assertion on appeal, there is also no indication in the record that Soto-Ramirez perjured herself when giving testimony at trial, or that the prosecution used false testimony to obtain Barnes's convictions. *People v Smith*, 498 Mich 466, 475-476; 870 NW2d 299 (2015).

In addition, as the trial court did not abuse its discretion in denying the motion for new trial, we need not consider whether the trial court abused its discretion by holding that Edwards's testimony was inadmissible hearsay.

However, we remand for the ministerial purpose of correcting the amended judgment of sentence, which incorrectly reflects that Barnes was convicted under MCL 750.90c, which prohibits the commission of a grossly negligent act against a pregnant individual. Barnes was convicted of assault of a pregnant individual causing miscarriage, stillbirth, or death of an embryo or fetus, so remand for correction of the amended judgment of sentence is necessary. See *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999).

Affirmed but remanded for the ministerial purpose of correcting the amended judgment of sentence. We do not retain jurisdiction.

/s/ Anica Letica
/s/ Michael J. Kelly
/s/ Mark T. Boonstra